UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK HARDIMAN,

        Petitioner,

CASE NO. 1:06-CV-177

v.

HON. ROBERT J. JONKER

CINDI CURTIN,

        Respondent.

_____/

# ORDER AND JUDGMENT APPROVING REPORT AND RECOMMENDATION

The Court has reviewed the Magistrate Judge's Report and Recommendation (docket # 44), and Petitioner's objection to it (docket # 45). Under the Federal Rules of Civil Procedure, where, as here, a party has objected to portions of a Report and Recommendation, "[t]he district judge . . . has a duty to reject the magistrate judge's recommendation unless, on de novo reconsideration, he or she finds it justified." 12 WRIGHT, MILLER, & MARCUS, FEDERAL PRACTICE AND PROCEDURE § 3070.2, at 381 (2d ed. 1997). Specifically, the Rules provide that:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C). De novo review in these circumstances requires at least a review of the evidence before the Magistrate Judge. *Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981).

The Report and Recommendation recommends that Petitioner's habeas corpus petition be denied. Petitioner raises numerous objections, most of which simply restate the arguments advanced

in his habeas petition. Ultimately, none of these objections undermine the conclusion of the Magistrate Judge. Accordingly, Petitioner's habeas petition must be dismissed.

**I.    Background**

Petitioner is serving a life sentence for first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and kidnapping. A jury convicted Petitioner after hearing testimony that he lured the victim, Larry Taylor, to a drug house, attacked Taylor with a bat, stuffed him into the trunk of a car, drove him to a remote location and shot him in the head. A separate jury seated at the same trial convicted Petitioner's co-defendant Heath Lamont Nelson on similar charges.

Petitioner unsuccessfully appealed his conviction through the Michigan court system. He later pursued post-conviction relief in the state system, but to no avail. His federal habeas petition raises seven grounds for habeas relief. Five of the claims reassert issues raised on direct appeal; Petitioner first attempted to raise the two remaining claims in his state post-conviction proceeding.

**II.    Claims Raised on Direct Appeal**

Petitioner alleges the trial court improperly admitted prior bad acts evidence, failed to enforce its discovery orders, and improperly limited cross-examination of a key witness. Petitioner argues these decisions violated his Sixth Amendment and Due Process rights, but he fails to show that the trial court's decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). As detailed throughout the Report and Recommendation, the trial court and the Michigan Court of Appeals identified the appropriate legal principles and applied them in a manner that was not objectively unreasonable, and Petitioner fails to identify any Supreme Court precedent reaching a decision opposite that of the trial court or

2

the Michigan Court of Appeals "on a set of materially indistinguishable facts." *Lopez v. Wilson*, 426 F.3 339, 342 (6th Cir. 2005) (en banc) (citing *Williams*, 529 U.S. at 412-13). Consequently, Petitioner is not entitled to federal habeas relief based on any of these arguments. *See id.*

Petitioner also argues his trial counsel was ineffective because counsel neglected to interview a potential witness, Keith Hopskin, before trial. As a result of counsel's alleged neglect, counsel mistakenly informed the jury in opening arguments that Hopskin would testify when in fact Hopskin later invoked his Fifth Amendment rights and refused to take the stand. The record is clear that Petitioner's counsel did interview Mr. Hopskin before trial. Hopskin agreed to testify but later changed his mind. Hopskin's change of heart does not make Petitioner's trial counsel ineffective under the Sixth Amendment standard, nor has Petitioner established any prejudice resulting from counsel's opening statements. *See Strickland v. Washington*, 466 U.S. 687 (1984).

Finally, Petitioner argues the prosecutor's misconduct in the trial court resulted in a violation of his Due Process rights. In support of this argument, Petitioner identifies certain isolated statements of alleged impropriety uttered by the prosecutor in his closing argument. Assuming *arguendo* that these statements were improper, Petitioner fails to present any evidence that they were "so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (" The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."). Consequently, habeas relief on this ground is unavailable.

## III.  Claims Raised in State Post-Conviction Proceeding

Petitioner argues that the prosecutor engaged in misconduct by intimidating Keith Hopskin into not testifying. According to Petitioner, the prosecutor's alleged threats to Mr. Hopskin violated

Petitioner's Due Process and Sixth Amendment rights because they thwarted his efforts to mount a plausible defense. Petitioner raised this claim for the first time in a motion for post-conviction relief in state trial court, after his unsuccessful attempts to overturn his conviction on direct appeal. The trial court rejected Petitioner's post-conviction claim in a summary opinion, and he unsuccessfully appealed that decision to the Court of Appeals and the Michigan Supreme Court.

The prosecution in a criminal case may not "substantially interfere" with a defense witness's free and unhampered determination to testify. *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001). The prosecutor may–and indeed in some cases must–advise a witness of the consequences of testifying, but where "the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (quoting *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991)). But even where the prosecutor's actions may legitimately be viewed as unnecessary and coercive threats made for no other valid purpose than to intimidate, the defendant still must show the prosecutor's actions prejudiced him in some way. *Id.* at 833-34; *Emuegbunam*, 268 F.3d at 400.

The premise of Petitioner's argument is that Keith Hopskin would have offered exculpatory testimony but for the prosecutor's allegedly unconstitutional threats. Petitioner has submitted an affidavit from Mr. Hopskin–dated more than one year after Petitioner's conviction–detailing Hopskin's involvement in the events leading up to the murder of Larry Taylor. (*See* Habeas Pet., docket # 1, Ex. I, Hopskin Aff.) According to Hopskin, he was at a drug house with Petitioner Hardiman, Heath Lamont Nelson, and other persons on the day of the murder. One of the other individuals present at the house, Howard Mayfield, asked Hopskin if he could obtain a gun. Hopskin

indicated that he could, and he left the house briefly before returning with a nine millimeter pistol, which he sold to Mayfield for $300 and some marijuana. (*Id.*; *see also* Habeas Pet., docket # 1, Ex. J, Police Report). This is the weapon that, at least presumably, was used to kill Larry Taylor. The Hopskin Affidavit is arguably of marginal exculpatory value for Petitioner because Hopskin states that when he returned to the drug house with the nine millimeter pistol, he did not see Petitioner there anymore.[1] The implication is that Petitioner left the company of his co-defendant before the murder took place.

After detailing his efforts to procure the murder weapon, Mr. Hopskin goes on to swear that "Right before I was to testify the prosecutor (Gary Garby) told me that if I testified on behalf of Mark Hardiman he would charge me with the same charges as Mark Hardiman was charged with, so I plead the 5th Amendment at the trial." Assuming the truth of Hopskin's statement regarding the prosecutor, the affidavit does not establish that the prosecutor substantially interfered with Mr. Hopskin's "free and unhampered determination to testify." *See Emuegbunam*, 268 F.3d at 400. Hopskin's own sworn statements indicate he voluntarily obtained the murder weapon and then sold the weapon to other persons involved in the murder. (*See* Hopskin Affidavit at ¶ 6.) Under these circumstances, the prosecutor's decision to warn Hopskin of the consequences of his testimony was eminently reasonable. *See Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2006) (noting that, where the witness may be a subject in a criminal prosecution, the ABA standards of professional misconduct impose an ethical obligation on the prosecutor to advise a witness of his or her right not

---

[1] This statement concerning Petitioner's whereabouts is in direct conflict with Mr. Hopskin's previous statement, given to police less than one month after the Larry Taylor shooting, that Petitioner was indeed present at the drug house both before and after Hopskin's returned with the murder weapon. (Habeas Pet., docket # 1, Ex. J.)

5

to testify). Indeed, the trial judge determined that, given Hopskin's prior statements to police and his expected testimony, he was entitled to invoke the Fifth Amendment. Petitioner does not challenge that aspect of the trial court's ruling, and there is no serious doubt that the prosecutor had a duty to inform Hopskin of the consequences of his testimony, one of which was almost certain prosecution for murder and kidnapping. *See id.*; *Cf. People v. Robinson*, 475 Mich. 1, 5-15 (2006) (explaining the scope of conspirator and accomplice liability under Michigan law).

This is not a case where the trial judge unreasonably singled out a particular witness and repeatedly admonished him in open court about the dangers of testifying. *See Webb v. Texas*, 409 U.S. 95 (1972) (per curiam). Nor is this a case where government agents approached a witness outside the courtroom and gratuitously threatened him after the prosecution and the court already had fully advised the witness of his rights. *See United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (per curiam). Viewing the prosecutor's statement in light of the context of the underlying murder case, it is clear that the statement was neither unjustified nor duplicative. *Cf. Webb*, 409 U.S. at 97 (finding substantial interference where the trial judge "gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury"). Thus, given the gravity of what Hopskin planned to testify to, the prosecutor's statement was not so egregious as to substantially interfere with Hopskin's decision to testify. *See Emuegbunam*, 268 F.3d at 401 (declining to find substantial interference where the trial judge "sought further assurances from the proffered witness himself that his decision not to testify derived from concerns about his exposure to potential criminal liability based upon questions that the prosecution and defense wished to pose, rather than from the idle threats of his jailers"). Mr. Hopskin's decision not to implicate himself in open court on murder and kidnapping charges was his alone. The prosecutor's statement may have made Mr. Hopskin more

aware of the potential consequences of testifying, but it did not rise to an unconstitutional interference with Petitioner's rights under the Due Process Clause or the Sixth Amendment.

Even if the Court were to find the prosecutor's statement amounted to a substantial interference with Hopskin's decision to testify, there is no evidence of prejudice on this record. Multiple witnesses testified that they saw Petitioner attack the victim with a baseball bat, and that Petitioner aided in stuffing the victim in the trunk of his car and transporting him to the murder site. (Habeas Pet., docket # 1, at 21-23.) The victim's DNA was found in Petitioner's car. (*Id.* at 42.) One witness testified that he saw Petitioner shoot the victim in the head at point-blank range. (*Id.* at 36.) Under the circumstances, it is difficult to see how Hopskin's statements that he did not personally observe Petitioner when Hopskin delivered the nine millimeter pistol to the drug house would have impacted the outcome of this case. This is especially true in light of Hopskin's previous, contradictory statement to police that Petitioner was in fact present at the home when Hopskin delivered the murder weapon. Accordingly, Petitioner cannot obtain habeas relief on the basis of the statements contained in the Hopskin Affidavit. *See*, *e.g.*, *Emuegbunam*, 268 F.3d at 400 (explaining that defendant's right to call witness in his defense is subject to harmless error analysis).

Petitioner also argues his appellate counsel was ineffective because counsel failed to file with the Michigan Court of Appeals a supplemental appellate brief drafted by Petitioner. Petitioner asserts, "I believe the sup brief issue was a lot stronger than a few of the appeal issues and if it was filed properly it would have received some action on direct appeal." (Petitioner's Objections, docket # 45, at 6.) From the appendix attached to his habeas petition, it appears Petitioner wanted to raise on appeal the constitutional argument based on Keith Hopskin's affidavit. For the reasons discussed

7

above, that defense is unavailing, and therefore appellate counsel's failure to raise the argument does not constitute ineffective assistance and could not have prejudiced Petitioner.

IV.     **Certificate of Appealability**

Before Petitioner may appeal the Court's dismissal of his petition, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); FED. R. APP. P. 22(b)(1). The Federal Rules of Appellate Procedure extend to district judges the authority to issue certificates of appealability. FED. R. APP. P. 22(b); *see also Castro v. United States*, 310 F.3d 900, 901-02 (6th Cir. 2002). Thus the Court must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); FED. R. APP. P. 22(b)(1); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make the required "substantial showing," the petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Petitioner has not made the required "substantial showing" in this case. Reasonable jurists could not debate the outcome of any of Petitioner's claims, and therefore Petitioner should not be allowed to proceed further. *See id.*

**ACCORDINGLY, IT IS ORDERED** that the Report and Recommendation of the Magistrate Judge, filed on January 15, 2009, is approved, as further supplemented by this Order.

**IT IS FURTHER ORDERED** that Petitioner's habeas corpus petition (docket # 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.


Dated:      August 25, 2009             /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       UNITED STATES DISTRICT JUDGE